**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEBIL AYDIN, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>  v.<br><br>SIGNET JEWELERS LIMITED, VIRGINIA C. DROSOS, and MICHELE L. SANTANA,<br><br>        Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nebil Aydin ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Signet Jewelers Limited ("Signet" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Signet; and (c) review of other publicly available information concerning Signet.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Signet securities between August 24, 2017, and November 21, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Signet is purportedly the world's largest retailer of diamond jewelry.  The Company claims to operate thousands of stores in North America, and some in the United Kingdom, through well-known brand names such as "Kay," "Jared," "Zales," and "Peoples Jewellers."

3.      On November 21, 2017, Signet issued a press release disclosing that its Q3 2017 same store sales were down five percent, in part due to "systems and process disruptions associated with outsourcing of the credit portfolio." On a conference call held the same day, Defendant Virginia C. Drosos ("Drosos"), Signet's Chief Executive Officer ("CEO") stated that "disruptions in our systems and processes during our credit outsourcing transition . . . impacted

---

[1] "Defendants" refers to Signet Jewelers Limited, Virginia C. Drosos, and Michele L. Santana, collectively.

our comp sales by 60 basis points."  Drosos further stated that the disruptions were "primarily related to the conversion of IT systems and the magnitude of in-store process changes related to the new program."

4.      On this news, Signet's share price fell $23.05 per share, or 30.4%, to close at $52.79 per share on November 21, 2017, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the Company's efforts to convert IT systems in connection with the credit portfolio transition were negatively impacting sales; (2) that the magnitude of in-store process changes related to the new credit program were negatively impacting sales; (3) that, as such, the Company was experiencing systems and process disruptions associated with the outsourcing of its credit portfolio; (4) that the disruptions were negatively impacting the Company's performance; and (5) that, as a result of the foregoing, Defendants' positive statements about Signet's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's shares are actively traded within this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Nebil Aydin, as set forth in the accompanying certification, incorporated by reference herein, purchased Signet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Signet Jewelers Limited is a Bermuda corporation with its principal executive offices located in Bermuda.  Signet's shares trade on the New York Stock Exchange (the "NYSE") under the symbol "SIG."

13.     Defendant Virginia C. Drosos was, at all relevant times, the Chief Executive Officer of Signet.

14.     Defendant Michele L. Santana ("Santana") was, at all relevant times, the Chief Financial Officer ("CFO") of Signet.

15.     Defendants Drosos and Santana are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Signet's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Signet is purportedly the world's largest retailer of diamond jewelry.   The Company claims to operate thousands of stores in North America, and some in the United Kingdom, through well-known brand names such as "Kay," "Jared," "Zales," and "Peoples Jewellers."

### Materially False and Misleading
### Statements Issued During the Class Period

17.     The Class Period begins on August 24, 2017.   On that day, Signet issued a press release entitled, "Signet Jewelers Reports Second Quarter Financial Results."   Therein, the Company, in relevant part, stated:

Signet Jewelers Limited ("Signet") (NYSE:SIG), the world's largest retailer of diamond jewelry, today announced its results for the 13 weeks ("second quarter Fiscal 2018") ended July 29, 2017.

**Summary:**

- Positive second quarter performance with same store sales ("SSS") up 1.4%, driven by eCommerce platform improvements, Mother's Dayperformance and timing, effective marketing and bridal promotion initiatives.

- Diluted earnings per share ("EPS") of $1.33, reflecting disciplined cost management and early benefits from strategic decision to outsource the credit portfolio.

- Repurchased 12% of Signet equity outstanding in an accelerated open market share repurchase.

- Announced agreement to acquire R2Net, owner of JamesAllen.com, to rapidly enhance digital capabilities and further accelerate OmniChannel strategy. See separate release.

- Reiterated Fiscal 2018 SSS guidance; updated Fiscal 2018 EPS guidance to include the early benefits from outsourcing of credit, partially offset by costs associated with CEO separation and R2Net acquisition.

Virginia C. Drosos, Chief Executive Officer of Signet Jewelers, said, "Our encouraging second quarter performance reflects Signet's fundamental competitive strengths and the progress we are making on our strategic priorities. We delivered positive same store sales performance and managed our cost base to deliver operating margin expansion in a highly promotional environment. Further, today we announced the acquisition of JamesAllen.com to add a leading, fast-growing online jeweler to our portfolio. The acquisition will enhance our innovation and digital capabilities with R2Net's technology to create a best-in-class OmniChannel shopping experience across our banners. Based on this positive momentum, we are increasingly confident that Signet is well-positioned for the upcoming holiday selling season and on track to achieve our financial targets for the year.

"I am stepping into the CEO role at an exciting time for Signet. Together with my leadership team, I am acutely focused on deepening our understanding of consumers, reinventing our OmniChannel shopping experience, and elevating our brand messaging and product assortment.

"I thank our Team Members for their dedication and hard work. I look forward to our journey together to create an agile, innovative, and efficient Signet that is

well-positioned for sustainable, profitable growth and value creation."

**Financial Guidance:**

Signet reiterated its Fiscal 2018 SSS guidance and provided an update to its EPS guidance to reflect anticipated benefits of the strategic outsourcing of its credit portfolio, partially offset by chief executive officer separation costs and anticipated transaction costs associated with the announcement of the acquisition of R2Net. In the second quarter, Signet accelerated the repurchases of $400 million of shares associated with the credit transaction proceeds expected in October.

| | Initial Guidance, March 9 | Est. change (per share unless indicated) | Guidance, August 24 |
|---|---|---|---|
| SSS | Down low-mid single-digit % | - | Down low-mid single-digit % |
| EPS | $7.00 - $7.40 | | $7.00 - $7.40 |
| Net impact from outsourcing credit portfolio[1] | | ($0.16) | |
| Net transaction cost including gain on sale of prime A/R[2] | | ($0.05) | |
| CEO Separation Costs | | ($0.03) | |
| R2Net transaction costs[3] | | ($0.10) | |
| Share repurchase acceleration[4] | | $0.50 | |
| EPS | | | **$7.16 - $7.56** |
| | | | |
| Effective tax rate | 24% - 25% | - | 24% |
| Weighted average common shares | 74 million - 75 million | (5 mill.) | 69 million - 70 million |
| Capital expenditures in $ | 260 million - 275 million | - | 260 million - 275 million |
| Selling square footage growth | -1% to 0% | - | -1% to 0% |

(1)     Net impact of outsourcing the credit portfolio includes: elimination of bad debt expense and late fee income from prime A/R; elimination of selling, general and administrative expenses ("SGA") related to in-house credit department; economic profit sharing on prime A/R; servicing fees associated with Genesis Financial's service of the remaining book; elimination of finance charge income from the prime A/R; and elimination of interest expense associated with the $600 million asset-backed securitization that will be repaid with proceeds from sale of the prime A/R.

(2)     Net impact includes: gain recognized on the reversal of the allowance for bad debt related to the prime A/R reclassified as assets held for sale; beneficial interest that will be recognized upon sale of prime A/R; and credit transaction costs related to legal, advisory, implementation and retention expense.

(3)     R2Net transaction costs include legal, advisory, and financing expenses. This does not include costs related to technology implementation or any impact related to R2Net operations post-closing.

(4)     In the second quarter, $400 million of share repurchases associated with the expected credit transaction proceeds to be received in October were accelerated.

18.     On August 29, 2017, Signet filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended July 29, 2017.  The Company's Form 10-Q was signed by Defendant Santana, and reaffirmed the Company's financial results announced in the press release issued on August 24, 2017.

19.     On October 23, 2017, Signet issued a press release entitled, "Signet Jewelers Completes First Phase of Strategic Outsourcing of Credit Portfolio."  Therein, the Company, in relevant part, stated:

Signet Jewelers Limited ("Signet") (NYSE: SIG), the world's largest retailer of diamond jewelry, announced today the completion of the first phase of the strategic outsourcing of its in-house credit program, including:

- The sale of its prime-only credit quality accounts receivable to the Columbus, Ohio-based card services business of Alliance Data Systems Corporation ("Alliance Data") (NYSE: ADS) for par value of $960

million at the time of closing;

- Outsourcing of the credit servicing function of its existing and future non-prime accounts receivable to Genesis Financial Solutions ("Genesis"); and

- Implementation of its lease-purchase program in partnership with Progressive Leasing.

Virginia C. Drosos, Chief Executive Officer of Signet, said: "The successful completion of the first phase of strategic outsourcing of our credit portfolio has allowed us to reduce our outstanding debt and return capital to our shareholders. In addition, the transaction enables us to optimize our business model with greater organizational focus on driving the growth of our OmniChannel retail platforms and delivering a true Customer First experience."

Ms. Drosos added: "A key priority of our credit transaction has been to minimize impact on our credit customers and substantially maintain our net sales. This has been achieved through our partnership with Alliance Data and Genesis to continue to provide the full suite of our credit offerings for our customers, and adding an incremental lease-purchase financing option with Progressive Leasing. I want to thank our partners and Signet team for their hard work in executing this complex transaction on time."

As previously announced, Signet and Alliance Data have entered into a seven-year program agreement under which Alliance Data will become the primary provider of credit, including funding, underwriting, servicing and associated program functions, to Signet's U.S. stores. Signet will receive future payments from Alliance Data under an economic-sharing agreement.

Signet and Genesis have entered into a five-year servicing agreement, under which Genesis will provide credit servicing functions for Signet's existing non-prime accounts receivable, as well as future non-prime account originations. Signet will retain the existing non-prime accounts receivable on its balance sheet and continue to originate the majority of new accounts until the expected completion of the second phase of credit outsourcing.

Finally, Signet implemented a lease-purchase program in partnership with Progressive Leasing across its U.S. stores. Lease-purchase is an incremental payment option available for customers who do not qualify for Signet's credit programs, or do not wish to pursue a credit option to finance the purchase of our merchandise. Signet believes the program represents an incremental growth opportunity.

As part of the transaction, nearly all existing Signet team members supporting credit operations have been transferred to Alliance Data or Genesis, or retained by Signet to facilitate a smooth transition for Signet's team members and customers.

In the first phase of strategic outsourcing of credit, Signet completed the sale of approximately 55% of its credit portfolio to Alliance Data and outsourced servicing of its full credit programs. Signet is in ongoing discussions with several interested funding partners related to the second phase, which is expected to be completed in the first half of calendar year 2018. In the second phase, Signet expects to sell remaining accounts receivable on its balance sheet at the time of the transaction and fully outsource new account originations to a third party.

**Use of Proceeds, Accounting Considerations and Financial Impact**

Signet received $960 million of proceeds from the sale of its prime-only accounts receivable to Alliance Data. As previously indicated, Signet directed the sale proceeds to fully repay its $600 million securitization facility and repurchase shares earlier in the year based on opportunistic market conditions. In the second quarter of Fiscal 2018, the Company repurchased 12% of its outstanding shares using cash on hand and revolver borrowings. Therefore, the remaining $360 million of sale proceeds will be used to repay the $350 million short-term loan used to finance the R2Net acquisition, which would otherwise be financed through revolver borrowings.

As previously disclosed, Signet will report a $10 million pre-tax, non-cash gain at closing reflecting the future profit sharing agreement with Alliance Data. Total transaction costs related to legal, advisory, implementation and retention expense were $36 million for the full year Fiscal 2018, of which $30 million was recognized in the third quarter and $6 million was recognized in the second quarter.

20.     The above statements contained in ¶¶17-19 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's efforts to convert IT systems in connection with the credit portfolio transition were negatively impacting sales; (2) that the magnitude of in-store process changes related to the new credit program were negatively impacting sales; (3) that, as such, the Company was experiencing systems and process disruptions associated with the outsourcing of its credit portfolio; (4) that the disruptions were negatively impacting the Company's sales; and (5) that, as a result of the foregoing, Defendants' positive statements about Signet's business, operations, and prospects,

were false and misleading and/or lacked a reasonable basis.

**<u>Disclosures at the End of the Class Period</u>**

21.     On November 21, 2017, Signet issued a press release entitled "Signet Jewelers Reports Third Quarter Financial Results."  Therein, the Company disclosed that "[s]ame store sales [were] down 5.0%, including an estimated 120 basis point negative impact due to weather-related incidents and systems and process disruptions associated with outsourcing of the credit portfolio."    Defendants  Drosos  was  quoted  in  the  press  release  stating  that  "unexpected disruptions during the transition of our credit services . . . further negatively impacted results." The Company further elaborated, stating that:

> Signet is experiencing greater than anticipated disruptions related to the complex credit transition process. Signet and its credit partners are working with great urgency to resolve these issues, and while the critical majority of the systems-related issues have been identified and restored, the Company expects the financial impact to carry forward into the fourth quarter given the significant changes to the credit-related processes.
>
> As a result, Signet now expects Fiscal 2018 SSS to be down a mid single-digit percentage and EPS to be in the range of $6.10 and $6.50.
>
> The Company is in advanced discussions with interested funding partners related to the second phase of its credit outsourcing, which is expected to be completed in the first half of calendar year 2018.

22.     On  the  same  day,  the  company  held  a  conference  call  to  discuss  its  Q3  2017 results.  On the call, Defendant Drosos stated that "disruptions in our systems and processes during our credit outsourcing transition . . . impacted our comp sales by 60 basis points."  Drosos further stated that the disruptions were "primarily related to the conversion of IT systems and the magnitude of in-store process changes related to the new program."  In greater part, Drosos stated:

> We also faced headwinds from weather-related incidents and disruptions in our systems  and  processes  during  our  credit  outsourcing  transition.  These  events

further pressured our results and impacted our comp sales by 60 basis points each. I'll discuss credit in more detail in a few minutes.

. . .

In total, for the third quarter, we recorded a loss of $0.20 per share, including transaction costs of $0.25 and a $0.10 negative impact of the weather and credit-related events that I mentioned moments ago. As you can see, $0.35 of the loss was related to transactions, weather, and credit disruption.

. . .

I'd like to take a moment to provide more insight into our credit outsourcing transition.

As you know, in October, we completed the first phase of strategic outsourcing of our credit portfolio to Alliance Data and Genesis Financial Solutions. This was the right strategic decision for Signet, as it allows us to derisk our balance sheet, streamline our organizational and capital structure, and place a greater focus on what we do best, delivering an outstanding OmniChannel jewelry shopping experience for our customers.

This was a very complex transaction involving over 2 million credit accounts. And therefore, execution of the transition has been a priority for us since we announced the transaction in May. We've had a multifunctional team working in concert with our new partners, testing systems, and working through all aspects of the transition.

Unfortunately, we experienced significant executional disruptions related to the transition. These were primarily related to the conversion of IT systems and the magnitude of in-store process changes related to the new program. And in the first several weeks, the issues had a compounding impact.

For example, server interruptions and downside—downtime resulted in an overwhelming number of calls to our partners' customer service centers, leading to extraordinarily long wait times. This resulted in a sub-optimal credit experience for our store consultants and customers. We have been working with urgency to resolve these issues.

We're confident that we've fixed the critical majority of the systems issues and our internal process metrics have improved in recent weeks. However, we haven't seen a full recovery yet, and so we expect credit sales to continue to be impacted in Q4, negatively affecting our fiscal 2018 guidance.

I want to assure you that the credit situation has the full attention of our leadership team, partners, and team members and will remain one of my personal top

priorities until the entire issue has been resolved. This level of disruption to our customer service is unacceptable. We will remain resolutely focused on improving the reliability of our operations to be able to drive sustainable and predictable growth at Signet.

23.     On this news, Signet's share price fell $23.05 per share, or 30.4%, to close at $52.79 per share on November 21, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Signet securities between August 24, 2017, and November 21, 2017, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Signet's securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Signet shares were traded publicly during the Class Period on the NYSE.  As of November 28, 2017, Signet had 60,516,066 common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Signet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

27.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Signet; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

30.     The market for Signet's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures

to disclose, Signet's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Signet's securities relying upon the integrity of the market price of the Company's securities and market information relating to Signet, and have been damaged thereby.

31. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Signet's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Signet's business, operations, and prospects as alleged herein.

32. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Signet's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

33.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

34.     During the Class Period, Plaintiff and the Class purchased Signet's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

35.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Signet, his/her control over, and/or receipt and/or modification of Signet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Signet, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

36.     The market for Signet's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Signet's securities traded at artificially inflated prices during the Class Period.  On

November 17, 2017, the Company's share price closed at a Class Period high of $76.58 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Signet's securities and market information relating to Signet, and have been damaged thereby.

37. During the Class Period, the artificial inflation of Signet's share price was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Signet's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Signet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

38. At all relevant times, the market for Signet's securities was an efficient market for the following reasons, among others:

(a) Signet shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Signet filed periodic public reports with the SEC and/or the NYSE;

(c) Signet regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Signet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

39.     As a result of the foregoing, the market for Signet's securities promptly digested current information regarding Signet from all publicly available sources and reflected such information in Signet's share price. Under these circumstances, all purchasers of Signet's securities during the Class Period suffered similar injury through their purchase of Signet's securities at artificially inflated prices and a presumption of reliance applies.

40.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

41.     A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Signet who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### <u>Against All Defendants</u>

43.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

44.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Signet's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

45.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Signet's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Signet's financial well-being and prospects, as specified herein.

47.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Signet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Signet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

48.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

49.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Signet's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

50. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Signet's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Signet's securities during the Class Period at artificially high prices and were damaged thereby.

51. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Signet was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Signet securities, or,

if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

52.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

54.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of Signet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.     As set forth above, Signet and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 15, 2017                    **GLANCY PRONGAY & MURRAY LLP**


                                            By:  *s/ Lesley F. Portnoy*
                                            Lesley F. Portnoy (LP-1941)
                                            230 Park Ave., Suite 530
                                            New York, New York 10169
                                            Telephone: (212) 682-5340
                                            Facsimile: (212) 884-0988
                                            Email:  lportnoy@glancylaw.com

                                            **GLANCY PRONGAY & MURRAY LLP**
                                            Lionel Z. Glancy
                                            Robert V. Prongay
                                            Charles H. Linehan
                                            1925 Century Park East, Suite 2100
                                            Los Angeles, CA 90067
                                            Telephone: (310) 201-9150
                                            Facsimile: (310) 201-9160

                                            **LAW OFFICES OF HOWARD G. SMITH**
                                            Howard G. Smith
                                            3070 Bristol Pike, Suite 112
                                            Bensalem, PA 19020
                                            Telephone: (215) 638-4847
                                            Facsimile: (215) 638-4867

                                            *Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

Signet Jewelers Limited, SECURITIES LITIGATION

I, Nebil Aydin, certify:

1.  I have reviewed the complaint and authorized its filing and/or adopted its allegations.

2.  I did not purchase Signet Jewelers Limited, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Signet Jewelers Limited, during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ____ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 12/13/2017

_____
(Please Sign Your Name Above)

(REDACTED)

**Nebil Aydin's Transactions in
Signet Jewelers Limited (SIG)**

| Settlement Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 11/22/2017 | Bought | 100 | $76.0850 |
| 11/22/2017 | Bought | 800 | $76.1200 |
| 11/22/2017 | Bought | 2,100 | $76.0899 |